DOCKETED

DEC 0 1 2004

FILED FOR DOCKETING

04 NOV 30 AM 10: 43

CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| YASSIN HAMWI, On Behalf of Himself and All Others Similarly Situated, | : |
| Plaintiff, | : |
| v. | : |
| AON CORPORATION, PATRICK RYAN, MICHAEL O'HALLERAN, DAVID BOLGER, THOMAS STACHURA, JOHN RESCHKE, NANCY GROSS, ROBERT HURWITZ, LESTER B. KNIGHT, EDGAR D. JANNOTTA, JAN KALF, J. MICHAEL LOSH, R. EDEN MARTIN, RICHARD C. NOTEBAERT, and JOHN W. ROGERS, JR., | : |
| Defendants. | : |

JUDGE ANDERSEN



CIVIL ACTION NO.

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
EMPLOYER RETIREMENT
INCOME SECURITY ACT

MAGISTRATE JUDGE NOLAN

Plaintiff Yassin Hamwi, a participant in the AON Corporation 401(k) Savings Plan (the "Plan"), on behalf of himself and a class of all others similarly situated, allege as follows:

## INTRODUCTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan fiduciaries, including AON Corporation ("AON" or the "Company").

2.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. Employees participating in a 401(k) plan may have the option of purchasing the common stock of, or other investment options created by, their employer,



often the sponsor of the plan, for part of their retirement investment portfolios. Company stock is an investment alternative in the Plan

3.      Plaintiff was an employee of AON and a participant in the AON Plan during the Class Period. Plaintiff's retirement investment portfolio included AON stock during the Class Period.

4.      Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to plaintiff and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of AON common stock ("AON Stock" or "Company Stock").

5.      During the Class Period, as described herein, Defendants knew or should have known that AON stock was an imprudent investment alternative for the Plan due to the rampant business improprieties occurring at the Company. Upon information and belief, certain Defendants played an active role in implementing the business improprieties described herein to artificially inflate the value of Company stock during the Class Period.

6.      Defendants are liable under ERISA to restore losses sustained by the Plan as a result of their breaching of their fiduciary obligations.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).

8.      Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where the breaches took place, where one or more defendants reside or may be found, or where the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred.

## PARTIES

9.      Plaintiff Yassin Hamwi was an AON employee, a participant in the AON Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held AON stock in his retirement investment portfolio during the Class Period

10.      Defendant AON, through its various subsidiaries worldwide, serves its clients through three operating segments: Risk and Insurance Brokerage Services, which acts as an advisor and insurance broker, helping clients manage their risks and negotiating and placing insurance risk with insurance carriers through its global distribution network; Consulting, which provides advice and services to clients for employee benefits, compensation, management consulting, communications and human resources outsourcing; and Insurance Underwriting, which provides specialty insurance products, including supplemental accident, health and life insurance, credit life, accident and health insurance, extended warranty products and select property and casualty insurance products and services.

11.      Defendant Patrick G. Ryan ("Ryan") was, at all relevant times hereto, the Chairman of the Board and Chief Executive Officer of the Company. Ryan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  Upon information and belief, Ryan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Ryan participated in communications to

Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

12.     Defendant Michael D. O'Halleran ("O'Halleran") was, at all relevant times hereto, the President and Chief Operations Officer of the Company. O'Halleran as a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, O'Halleran was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. O'Halleran participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

13.     Defendant David Bolger ("Bolger") joined AON in early 2003 as Executive Vice President for Finance and Administration and assumed the role of Chief Financial Officer in April 2003. Upon information and belief, Bolger was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Bolger participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

14.     Defendant Thomas Stachura ("Stachura") was, at all times relevant hereto, an Administrator of the Plan and served as a member of the AON Savings Plan Committee. Upon

4

information and belief, Stachura was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Stachura participated in communications to Plan Participants, including, for example, by execution of the Company's Annual Statement on Form 11-K relating to shares of AON stock to be issued to Plan Participants.

15. Defendant John Reschke ("Reschke") was, at all times relevant hereto, an Administrator of the Plan and served as a member of the AON Savings Plan Committee. Upon information and belief, Reschke was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Reschke participated in communications to Plan Participants, including, for example, by execution of the Company's Annual Statement on Form 11-K relating to shares of AON stock to be issued to Plan Participants.

16. Defendant Nancy Gross ("Gross") was, at all times relevant hereto, an Administrator of the Plan and served as a member of the AON Savings Plan Committee. Upon information and belief, Gross was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Gross participated in communications to Plan Participants, including, for example, by execution of the Company's Annual Statement on Form 11-K relating to shares of AON stock to be issued to Plan Participants.

17. Defendant Robert Hurwitz ("Hurwitz") was, at all times relevant hereto, an Administrator of the Plan and served as a member of the AON Savings Plan Committee. Upon information and belief, Hurwitz was a fiduciary of the Plan within the meaning of ERISA in that he

5

exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Hurwitz participated in communications to Plan Participants, including, for example, by execution of the Company's Annual Statement on Form 11-K relating to shares of AON stock to be issued to Plan Participants.

18.     Defendant Lester B. Knight ("Knight") was, at all times relevant hereto, an Administrator of the Plan and served as a member of the AON Savings Plan Committee. Upon information and belief, Knight was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Knight participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

19.     Defendant Edgar D. Jannotta ("Jannotta") was, at all times relevant hereto, a Director and member of the Investment Committee of the Company's Board of Directors. Upon information and belief, Jannotta was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Jannotta participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

20.     Defendant Jan Kalf ("Kalf") was, at all times relevant hereto, a Director and a member of the Investment Committee of the Company's Board of Directors. Upon information and belief, Kalf was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii)

6

management and disposition of the Plan's assets. Kalf participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

21.     Defendant J. Michael Losh ("Losh") was, at all times relevant hereto, a Director and member of the Investment Committee of the Company's Board of Directors. Upon information and belief, Losh was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Losh participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

22.     Defendant R. Eden Martin ("Martin") was, at all times relevant hereto, a Director and member of the Investment Committee of the Company's Board of Directors. Upon information and belief, Martin was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Martin participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

23.     Defendant Richard B. Notebaert ("Notebaert") was, at all times relevant hereto, a President, Chief Operating Officer, a Director, member of the Investment Committee and Chairman of the Compensation Committee of the Company's Board of Directors. Upon information and belief, Notebaert was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii)

7

management and disposition of the Plan's assets. Notebaert participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

24. Defendant John W. Rogers, Jr. ("Rogers") was, at all times relevant hereto, a Director and Chairman of the Audit Committee of the Company's Board of Directors. Upon information and belief, Rogers was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Rogers participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of AON stock to be issued to Plan Participants.

25. The Defendants referred to in paragraphs 11-24 are collectively referred to herein as the "Individual Defendants."

26. The Defendants referred to in paragraphs 11 and 19-24 are collectively referred to herein as the "Director Defendants."

27. AON is a fiduciary of the Plan within the meaning of ERISA. AON exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. AON at all times acted through its officers and employees, including its Chief Executive Officer ("CEO") and members of its Board oversight to perform AON's Plan-related fiduciary functions in the course and scope of their employment.

28. AON had, at all applicable times, effective control over the activities of its officers and employees, including over their AON Plan-related activities. AON, through its Board of Directors, Executive Officers, or otherwise, had the authority and discretion to hire and terminate

8

said officers and employees. AON, through its Board and otherwise, also had the authority and discretion to appoint, monitor, and remove Directors, Officers and other employees from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their fiduciary duties under ERISA, such Defendant-fiduciaries breached duties they owed to Participants in the Plan and their beneficiaries. Accordingly, the actions of these fiduciaries are imputed to AON under the doctrine of respondent superior, and AON is liable for such actions.

### Unknown Fiduciaries

29. There are fiduciaries of the Plan whose identities are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

30. Defendants include named and *de facto* fiduciaries with respect to the Plan. All Defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

### THE PLAN

31. The AON Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. § 1002(3) and 1002(2)(A). The AON Plan is a legal entity which can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a Defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action, Plaintiff, who is described above, seeks relief on behalf of the Plan.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY STATUS

32.     During the Class Period, upon information and belief, the Individual Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

33.     During the Class Period, the Individual Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

34.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, AON chose to internalize its respective fiduciary functions.

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between November 1, 1998 through the present (the "Class Period) and whose accounts held Company stock.

36.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum thousands of members of the Class who participated in, or were beneficiaries of the Plan during the Class Period

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

   a.     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

   b.     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

   c.     whether Defendants violated ERISA; and

   d.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

38.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

11

41.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

42.    Aon, through its various subsidiaries worldwide, serves its clients through three operating segments: Risk and Insurance Brokerage Services, which acts as an advisor and insurance broker, helping clients manage their risks and negotiating and placing insurance risk with insurance carriers through its global distribution network; Consulting, which provides advice and services to clients for employee benefits, compensation, management consulting, communications and human resources outsourcing; and Insurance Underwriting, which provides specialty insurance products, including supplemental accident, health and life insurance, credit life, accident and health insurance, extended warranty products, and select property and casualty insurance products and services.

43.    On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks insurance industry." The article stated in part:

> In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.

12

Spitzer unveiled a law suit Thursday against the world's largest insurance broker Marsh & McLennan for a common industry practice known as "contingent commissions."

Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.

Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.

"The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

Shares of Marsh AIG and other leading insurance companies and brokers slumped.

Marsh dropped 14 percent to $39.70 and AIG lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AIG is headed by longtime CEO Hank Greenberg. His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating.

"The Hartford is cooperating fully with the New York Attorney's investigation," said ... a spokeswoman for the company.

13

44.     Upon revelation of these illegal acts, the Company's shares fell to $23.03, a loss of 16%.

45.     On October 19, 2004, *Bloomberg* issued an article entitled "Spitzer's Aon Probe Focuses on Reinsurance Business, WSJ Says." The article stated in part:

> New York State Attorney General Eliot Spitzer's probe of Aon Corp., the world's second-biggest insurance broker, spotlights the industry practice of insurance companies buying insurance policies, the Wall Street Journal said in its "Tracking the Numbers" column.
>
> Spitzer's office is investigating whether the Chicago-based company directed business to insurance companies in return for so-called reinsurance business for itself, the paper said, citing people familiar with the matter. The reinsurance business, or insurance policies for insurance companies, is the focus of the probe, because Spitzer suspects Aon's insurance-buying clients may not have received the best deal, the paper said.
>
> Last week, Aon said that soliciting fake price quotations, bid rigging and accepting payments from insurers for not shopping the business around "would violate Aon policies," and it believes its employees have not done so, the Journal said.

46.     On these revelations, the Company's shares fell to $19.20 from $21.20, a drop of 9%.

47.     On October 20, 2004, the *Chicago Tribune* issued an article entitled "Spitzer focuses probe on Aon; Regulator looks at reinsurance business deals." The article stated in part:

> Aon Corp.'s troubles deepened Tuesday, as regulators investigating the insurance brokerage industry signaled they now have the Chicago company in their sights.
>
> Already, the conflict-of-interest storm that broke last week over the entire brokerage sector has called into question whether Aon will be able to continue raking in the about $200 million in lucrative contingency fees – payments that contributed an estimated nearly 20 percent of the company's total earnings.

14

But now New York Atty. Gen. Eliot Spitzer is focusing specifically on Aon to determine whether it improperly tried to drum up business for its reinsurance brokerage business by arranging questionable quid pro quos with insurance providers.

And Spitzer is apparently unhappy with the level of cooperation from Aon. "They've very much been dragging their feet on the quantity and quality of their cooperation with us," said a person close to Spitzer's office.

Although Spitzer's probe has sparked a panicky sell-off of shares in Aon and its rivals, Wall Street analysts are finding it difficult to gauge what portion of Aon's earnings are at risk.

"There's a good probability that some of the contingent revenue will be gone next year," said Adam Klauber of Chicago-based Cochran, Caronia Securities. But it's impossible, yet, to know how much, the analyst said.

At Morningstar Inc., analyst Justin Fuller said in a recent report that the case may well undermine revenue growth and "could saddle the company with unpredictable legal and settlement costs for years to come."

Investors are not optimistic. Since Wednesday, Aon's shares have declined 31 percent, erasing well over $2 billion in market capitalization.

News of the investigation surfaced only two weeks after Aon's 67-year-old chief executive, Patrick Ryan, announced plans to step down from the top job as soon as the company can locate a successor.

Last week the often-aggressive Spitzer sent shock waves throughout the insurance brokerage sector by alleging in a civil lawsuit that the nation's leading broker, Marsh & McLennan Cos., has been cheating its clients by accepting payments from insurance companies in exchange for steering business their way.

That practice is widespread in the insurance brokerage business, Spitzer noted, contending that it "distorts and corrupts the insurance marketplace and cheats insurance customers."

15

If Spitzer succeeds in banning or curtailing those fees, then profit margins at Marsh, Aon and other insurance brokers will be badly hurt.

Marsh, which has seen its shares lose nearly half of their value in the last week, disclosed Tuesday that last year it received $853 million in such contingency fees. And Aon, second in size to Marsh, has said it received about $200 million in contingency fees.

Analysts consider such fees to be almost free money for the brokers and calculate that the bulk of those payments flow directly to a company's bottom line.

Insurance brokers like Marsh and Aon act as intermediaries between companies that are seeking insurance (typically big corporations with complex needs) and insurance companies that provide such coverage.

Insurance buyers hire brokers because they figure that even after paying the broker's fee, they'll get a better deal than they could find for themselves, given the complexity of the insurance market.

The fundamental premise of that relationship is that the broker will objectively find the best deal possible for the client. Spitzer's legal assault has raised so many hackles because it calls into question that assumption.

The fees, Spitzer says, were nothing more than "rewards for the business that Marsh ... steered and allocated to the insurance companies."

In Aon's case, the New York attorney general is said to also be examining a special twist on such tit-for-tat arrangements.

One of the Chicago company's specialties is brokering "reinsurance," in which insurance companies purchase insurance policies just to ensure that they can make good on all the risks they have taken on. In an interview, a person close to Spitzer's office said the attorney general is probing arrangements under which Aon has been compensated not via cash contingency fees, but rather by reciprocal business arrangements involving reinsurance.

In other words, there's evidence, this person said, that insurance companies to which Aon steered clients' business would repay Aon by throwing some of their reinsurance business to Aon.

16

An Aon spokesman declined to comment, beyond saying the company is fully cooperating with Spitzer's investigation.

If Spitzer's challenge permanently thins profit margins for the insurance brokerage business, it will undermine the strategy that was the centerpiece of Ryan's more than 20-year tenure as Aon's CEO.

Aon was formed in 1982 in the combination of two insurance-underwriting companies. Ryan, the head of one of the merged insurers, became head of the combined company. As time passed, he moved to diversify Aon into businesses with more stability, and wider profit margins, than the company's core insurance business.

Aon became a leading player in the consolidation of the once-fragmented insurance brokerage business, shelling out more than $4.5 billion to buy rivals.

The shopping spree transformed Aon into an insurance brokerage and consulting company which incidentally owns a much smaller insurance business. The breakneck acquisition pace caused recurring internal dislocations, inefficiencies and periodic earnings shortfalls that often kept Aon in Wall Street's doghouse. But with the acquisitions largely complete, those stresses have eased in recent years.

In fact, while the insurance business had served as a cash cow to fund Ryan's acquisitions, Aon two years sought to shed its insurance underwriting business; it took the insurance group off the block after receiving disappointing bids, however.

48.     During the Class Period defendants disseminated materially false and misleading statements about the Company's operations and business. The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     That the Company was receiving illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements";

17

(b)     That by concealing these "contingent commissions" and such "contingent commission agreements" the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars;

(c)     That as a result of (a)-(b) above, as more fully described ¶¶ 63-67, the Company's prior reported revenue and income was grossly overstated.

## DEFENDANTS' CONDUCT

49.     On October 31, 2002, the Company issued a press release entitled "Aon Reports 3rd Quarter Earnings; Announces Capital Enhancement Plans; Declares $0.15 Per Share Quarterly Dividend; Provides Future Outlook." The press release stated in part:

> Aon Corporation today reported third quarter and nine months 2002 earnings. The Company also announced plans designed to enhance Aon's financial strength and flexibility for the benefit of shareholders, clients and policyholders.
>
> Third Quarter Highlights
>
> Third quarter 2002 reported earnings increased to $0.46 per share from $0.26 per share in third quarter 2001. Operating segment reported revenues for third quarter were up 17% year-over-year reflecting strong demand for Aon's services and products.
>
> Patrick G. Ryan, chairman and CEO of Aon Corporation, stated, "Third quarter earnings showed excellent progress in Aon's brokerage segment with organic revenue growth of 18%, well above 10% in the second quarter. Large new outsourcing contracts drove consulting segment organic revenue growth to 15%, while also pressuring margins as new investments were made to support this business." Mr. Ryan added, "The underwriting segment had revenue growth of 14%. Buildup costs to support original growth plans for specialty property and casualty underwriting, however, exceeded new revenues and factored into the margin decline. Overall, we are encouraged by the progress we are

making - especially our strong new business achievements across many of our businesses."

Summary of Other Announcements

Aon has decided to enhance its capital position in anticipation of debt maturities in 2003 and a reduction of stockholders' equity due to pension obligations. In addition, the Company has concluded that short-term debt levels are too high. Mr. Ryan commented, "Maintaining strong credit and claims paying ratings is important to our business. Therefore, we believe it is prudent that we implement capital enhancement plans, including raising equity/equity-linked capital, refinancing debt and reducing the dividend, in order to reinforce Aon's financial strength." Approximately $1 billion of capital is expected to be raised of which $500 million to $600 million would be equity/equity-linked securities used to pay down debt and $400 million to $500 million would be debt to replace the same amount of existing debt in order to extend maturities.

50.     On November 4, 2002, the Company issued a press release entitled "Aon Sells $250 Million of 3.5% Convertible Debentures." The press release stated in part:

Aon Corporation today announced that it agreed to privately place $250 million aggregate principal amount of 3.5% convertible senior debentures due 2012. The debentures will be unsecured obligations, initially convertible into Aon common stock at a conversion ratio of 46.5658 shares per $1,000 principal amount of debentures (a conversion price of approximately $21.475 per common share). Aon has granted the initial purchasers of the debentures a 13-day option to purchase an additional $50 million aggregate principal amount of the convertible debentures. The placement of the debentures is expected to close on November 7, 2002.

Aon will use the net proceeds of the offering to repay short-term debt.

Aon Corporation (www.aon.com) is a holding company that is comprised of a family of insurance brokerage, consulting and insurance underwriting subsidiaries.

19

51.     On December 11, 2002, the Company issued a press release entitled "Aon Prices

Senior Notes Offering." The press release stated in part:

> Aon Corporation today announced the pricing of a private offering of
> senior notes pursuant to Rule 144A under the Securities Act of 1933.
> Aon is offering $225 million in aggregate principal amount of
> 7.375% senior notes due 2012 in a private offering to qualified
> institutional buyers. Net proceeds from the offering are expected to be
> approximately $223 million. The offering is expected to close early
> next week.

52.     On February 12, 2003, the Company issued a press release entitled "Aon Reports 4[th]

Quarter and Full Year 2002 Results." The press release stated in part:

> Aon Corporation today reported fourth quarter and full year 2002
> earnings.
>
> Fourth Quarter and Full Year Highlights
>
> Earnings per share for the fourth quarter increased to $0.59 from
> $0.10 one year ago. Full year 2002 earnings increased to $1.64 per
> share from $0.53 per share. Current and prior year periods were
> impacted by the World Trade Center (WTC) disaster and other
> factors. An analysis of earnings per share showing certain items that
> impacted current and prior period results is provided below. Strong
> demand for Aon's services and products and an increase in
> consolidated investment income drove fourth quarter revenues up
> 16% and full year revenues up 15%.
>
> Patrick G. Ryan, chairman and CEO of Aon Corporation, said,
> "Client demand continues to grow and I am encouraged by further
> improvement in our brokerage segment pretax income. While our
> 2002 performance improved, we did not reach our original targets for
> the year, due in part to some non-recurring items. Our fundamental
> businesses remain strong, however, and as we address under
> performance in certain units and improve expense management, we
> expect earnings to increase in 2003."
>
> Mr. Ryan added, "Looking back at 2002, I am extremely proud of
> Aon's employees for the way they came together after the tragedy of
> September 11. They have done an outstanding job recovering from

the World Trade Center disaster while helping our clients to rebuild. We continue to remember our employees and their families, as well as clients and friends whom we lost."

53.    On May 5, 2003, the Company issued a press release entitled "Aon Reports First Quarter 2003 Results; Operating Segment Pretax Income Grows 10%." The press release stated in part:

> Aon Corporation today reported first quarter 2003 earnings. Aon is providing enhanced segment disclosure that includes more detailed sub-segment revenue information and an updated presentation of segment reporting, as previously disclosed. First quarter 2003 segment results also reflect a refined methodology for allocating certain centrally controlled costs.
>
> Supplemental financial information covering 2001 and 2002 was provided in a Form 8-K on May 2, 2003 to conform the prior period segment presentation to the new format and to facilitate comparisons between periods. The Company's historical consolidated earnings per share, net income and pretax earnings have not changed as a result of the segment reclassifications and enhanced presentation.
>
> First Quarter Review
>
> Consolidated revenues of $2.388 billion increased 14% from a year ago. Foreign exchange translations accounted for 5% of the increase. First quarter 2003 net income was $152 million compared with $160 million a year ago. Earnings per share were $0.48 and $0.57, respectively. A 14% increase in average dilutive common and common equivalent shares outstanding resulting from the fourth quarter 2002 capital enhancement actions impacted the earnings per share comparisons.
>
> First quarter 2003 results included a negative $37 million pretax World Trade Center (WTC) item ($0.07 per share), approximately $32 million pretax ($0.06 per share) of increased pension costs and a $34 million pretax ($0.07 per share) increase in equity and other investment income within the Corporate and Other segment. The investment income improvement was due largely to a $45 million pretax increase in the value of Endurance Specialty Holdings, Ltd. warrants (received as part of Aon's co-sponsorship investment in

Endurance), offset somewhat by impairment writedowns of $28 million pretax in the quarter.

First quarter 2002 results included a favorable pretax $48 million ($0.11 per share) tax item that was partially offset by a previous spin off plan related special charge of $5 million pretax ($0.01 per share).

Patrick G. Ryan, chairman and CEO of Aon Corporation, said, "We achieved double-digit organic revenue growth in our operating segments driven by continued client demand for our products and services. Although pension costs increased in the quarter compared to last year, improvements in our risk and insurance brokerage businesses more than offset these incremental costs, and brokerage margins improved." Ryan added, "Consulting revenue growth was good but margins were impacted, in part, by an increase in lower margin outsourcing business. Insurance underwriting also had good top line growth, but under performance in certain warranty and P&C lines compressed margins."

54.     On August 5, 2003, the Company issued a press release entitled "Aon Reports Second Quarter and Six Months 2003 Results." The press release stated in part:

Aon Corporation today reported second quarter and six months 2003 results.

Second Quarter and Six Months Highlights

Net income for the second quarter was $146 million or $0.46 per share compared with breakeven results in the year ago period. Six months results increased to $298 million or $0.94 per share from $160 million or $0.57 per share in 2002. Excluding an expected $9 million ($0.02 per share) unusual World Trade Center (WTC) charge initially noted in first quarter 2003, net income per share was $0.48 for the second quarter. Six months net income per share, excluding unusual WTC charges ($0.09 per share) was $1.03.

Consolidated revenues grew 15% for the second quarter and six months to $2.4 billion and $4.8 billion, respectively, versus the year ago periods. Continued demand for Aon's services and products and improved investment income drove the increases. Foreign exchange translations accounted for 5% of the growth for both the quarter and first half.

22

Patrick G. Ryan, chairman and CEO of Aon Corporation, said, "Second quarter results showed steady improvement in our risk management and insurance brokerage operations, much better results in insurance underwriting, and good core performance in consulting given the current economic climate. Client demand for our services and products continues to be robust, as evidenced by our solid organic revenue growth, and I am encouraged by the progress we have made in our businesses."

Ryan added, "We are working diligently to increase our operating margins by further tightening our expense management, and I believe we can increase our productivity as we continue to grow revenues."

Second Quarter Segment Review

Risk and Insurance Brokerage Services second quarter revenue grew 17% to $1.424 billion. Organic revenue growth for the total segment was 11%. Within the segment, organic revenue growth was 14% for the Americas (up from 13% in first quarter 2003), 10% for International, 13% for Reinsurance and 2% for Claims Services.

Pretax income increased 22% to $175 million from $144 million in second quarter 2002. Pretax margins improved to 12.3% from 11.9%. Excluding a previously reported $6 million special credit, pretax income in second quarter 2002 was $138 million and the pretax margin was 11.4%. As expected, defined benefit pension costs increased by approximately $28 million year-to-year in the segment. Claims services second quarter pretax income declined approximately $19 million from the prior year. Investment income was $8 million lower in the second quarter compared with a year ago, and second quarter 2002 results included $7 million of transition costs related to the business transformation.

Mr. Ryan commented, "Margins were up, despite increased pension costs and a decline in claims services results, which shows that most of our brokerage businesses have performed better than last year. Excluding the claims services decline, the second quarter brokerage margin was in line with our original expectation." Mr. Ryan added, "There is seasonality within the year, and our brokerage margins are highest in the fourth quarter. Given our current outlook, we continue to expect that the 2003 brokerage margin will exceed full year 2002."

23

55.     On November 4, 2003, the Company issued a press release entitled "Aon Reports

Third Quarter and Nine Months 2003 Results." The press release stated in part:

> Aon Corporation today reported third quarter and nine months 2003 results.
>
> Third Quarter and Nine Months Review
>
> Third quarter net income from continuing operations was $140 million or $0.44 per share compared with $121 million or $0.43 per share in 2002 before World Trade Center (WTC) items. Nine months net income from continuing operations before WTC items grew to $477 million or $1.50 per share from $289 million or $1.03 per share in 2002.
>
> Reported net income per share for the third quarter was $0.36 compared with $0.46 in 2002. Nine months reported results increased to $1.30 per share from $1.03 per share in 2002.
>
> Third quarter losses from discontinued operations were $0.08 and $0.01 per share in 2003 and 2002, respectively. Nine months comparable losses were $0.11 and $0.04 per share. The automobile finance service business that is being discontinued has been in run-off since first quarter 2001 (see below). WTC items were zero and a positive $0.04 per share, respectively, in third quarter 2003 and 2002. Similar nine months WTC comparisons were a negative $0.09 per share and a positive $0.04 per share.
>
> Patrick G. Ryan, chairman and CEO of Aon Corporation, said, "Our international brokerage and U.S. reinsurance businesses drove organic revenue growth in the quarter, which was tempered by lower than expected revenue in claims services and Americas brokerage. Overall brokerage results did not achieve our internal targets, and we will be implementing additional and more aggressive actions to improve both top and bottom line performance."
>
> Mr. Ryan added, "Consulting results have been pressured by the challenging economic environment, but I believe we are poised to improve our profitability in this business, especially if the employment picture begins to improve. Operating income in our underwriting business was up from unusually low levels a year ago, and we are seeing the benefits of our back-to-basics strategy."

24

56.     On February 10, 2004, the Company issued a press release entitled "Aon Reports

Fourth Quarter and Twelve Months 2003 Results." The press release stated in part:

> Aon Corporation today reported fourth quarter and twelve months
> 2003 results.
>
> Fourth Quarter and Twelve Months Review
>
> Net income per share for the fourth quarter grew to $0.67 from $0.59
> in 2002. Twelve months net income was $1.97 per share, up from
> $1.64 per share in 2002. Fourth quarter net income from continuing
> operations rose to $215 million or $0.67 per share from $186 million
> or $0.62 per share in 2002. Twelve months net income from
> continuing operations grew to $663 million or $2.08 per share from
> $486 million or $1.71 per share in 2002.
>
> Unusual World Trade Center (WTC) credits per share were $0.12 and
> $0.02, respectively, in fourth quarter 2003 and 2002. Twelve months
> unusual WTC credits were $0.03 per share and $0.06 per share for the
> comparable periods.
>
> Consolidated revenues grew 10% to $2.6 billion in the fourth quarter
> and 11% to $9.8 billion for the full year, compared with the year ago
> periods. Solid demand for Aon's services and products drove the
> increases, along with the positive influence of foreign exchange rates.
>
> Patrick G. Ryan, chairman and CEO of Aon Corporation, said, "We
> have more work ahead of us to achieve the true profit potential of our
> organization, but I am pleased with the progress we have made in
> several areas. Full year earnings per share were up, stockholders'
> equity has grown, leverage ratios have improved, and we made an
> early pension plan contribution equaling $100 million in the fourth
> quarter."
>
> Mr. Ryan added, "While margins in our insurance brokerage segment
> were lower than the prior year, primarily due to increased pension
> costs, we are committed to improving the margins in each of our
> major brokerage businesses. In addition, we are evaluating strategic
> options for our claims operations. Consulting did a good job of
> managing expenses in a challenging economic environment, and our

insurance underwriting business performed well with the exception of a run-off book of business."

57. On April 23, 2004, *Bloomberg* issued an article entitled "Spitzer Subpoenas Data From Marsh, Aon on Commissions." The article stated in part:

> New York Attorney General Eliot Spitzer, who shook up investment banks and mutual funds with investigations into stock research and trading, is examining potential conflicts of interest at insurance brokerages.
>
> Marsh McLennan Cos., Aon Corp. and Willis Group Holdings Ltd., the world's biggest insurance brokerages, said they received subpoenas about their practice of accepting payments from both sides of an insurance transaction. A number of brokers are receiving similar requests, Aon said.
>
> Spitzer, who extracted billions of dollars in settlements from banks and mutual funds, is looking at whether brokers are violating client relationships by receiving payments from the insurers with whom they place their clients' business.
>
> * * *
>
> The Washington Legal Foundation, an advocacy group and law firm, asked Spitzer two months ago to investigate brokers' payments from insurers on concerns they "compromise the broker's fiduciary duty to represent the best interests of their clients."

58. On May 4, 2004, *Bloomberg* issued an article entitled "Aon Says Fees Being Probed Were $200 Million in 2003." The article stated in part:

> Aon Corp., one of at least three insurance brokerages subpoenaed last month over the fees they charge insurers, said those payments generated revenue of about $200 million in 2003.
>
> New York Attorney General Eliot Spitzer is investigating whether brokers, who seek out insurance policies for clients from a number of providers for a fee, violate their relationships with clients by also accepting money from the insurers they select.

26

"We provide valuable services to underwriters that we need to be compensated for and the underwriters obviously agree," Chief Executive Patrick Ryan said on a conference call with analysts and investors. "We continue to believe that these agreements are entirely appropriate."

Insurance companies paid Aon $200 million, about 3.5 percent of Aon's $5.68 billion of brokerage revenue last year. They may represent a higher percentage of profit, because they have a few costs associated with them, analysts such as Fox-Pitt Kelton Inc.'s Jon Balkind have said. Aon's shares have declined about 7 percent since the company announced the subpoena.

59. On August 4, 2004, the Company issued a press release entitled "Aon Reports Second Quarter and Six Months 2004 Results." The press release stated in part:

Aon Corporation today reported second quarter and six months 2004 results.

Second Quarter and Six Months Review

Net income per share for the second quarter was $0.52 compared to $0.46 in 2003. Net income from continuing operations rose to $180 million or $0.54 per share from $155 million or $0.49 per share a year ago.

Six months net income per share for 2004 and 2003 were $1.04 and $0.94, respectively. Net income from continuing operations and the related per share amounts for six months increased to $371 million or $1.13 from $316 million or $1.00, respectively.

Patrick G. Ryan, chairman and CEO of Aon Corporation, said, "The risk and insurance brokerage and consulting segments showed improved expense discipline in the second quarter and their six month profit margins increased year over-year. Organic revenue in risk and insurance brokerage did not grow as expected in the second quarter, however, pressuring the profit margin. A more rapid decrease in property and casualty premium rates contributed to the decline. We are working diligently to enhance our profitability through better organic growth and tighter expense management."

Mr. Ryan added, "We completed an outsourcing contract for IT infrastructure in the U.S. and we have an agreement in principle to sell a majority interest of our Cambridge Integrated Services claims business. Both of these actions will increase our profit margins."

In first quarter 2004, Aon accelerated the process for determining and approving certain discretionary incentive compensation. This had no effect on the six months comparisons at either the consolidated or segment level. However, approximately $43 million of discretionary incentive compensation was accrued in first quarter 2004 that would have been expensed in second quarter 2004 under the year ago process.

Endurance Specialty warrant gains were zero and $0.04 per share for second quarter 2004 and 2003, respectively, and $0.01 per share and $0.13 per share for the comparable six month periods. Second quarter and six months 2003 results included a $0.02 per share and a $0.09 per share World Trade Center (WTC) unusual charge, respectively. A reinsurance brokerage runoff unit was added to discontinued operations during second quarter 2004 as described below.

Consolidated revenues grew 6% for the second quarter and 7% for six months compared with the year ago periods. Foreign exchange translation accounted for 3% and 5% of the growth for the second quarter and first half 2004, respectively.

60.    On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks

insurance industry." The article stated in part:

In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.

Spitzer unveiled a law suit Thursday against the world's largest insurance broker Marsh & McLennan for a common industry practice known as "contingent commissions."

Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies

28

offering the highest commissions, rather than the ones most suited to their customers.

Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.

"The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

Shares of Marsh AIG and other leading insurance companies and brokers slumped. Marsh dropped 14 percent to $39.70 and AIG lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AIG is headed by longtime CEO Hank Greenberg. His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating.

"The Hartford is cooperating fully with the New York Attorney," said ... a spokeswoman for the Company.

61.    On October 19, 2004, *Bloomberg* issued an article entitled "Spitzer's Aon Probe

Focuses on Reinsurance Business, WSJ Says." The article stated in part:

New York State Attorney General Eliot Spitzer's probe of Aon Corp., the world's second-biggest insurance broker, spotlights the industry practice of insurance companies buying insurance policies, the Wall Street Journal said in its "Tracking the Numbers" column.

Spitzer's office is investigating whether the Chicago-based company directed business to insurance companies in return for so-called

reinsurance business for itself, the paper said, citing people familiar with the matter. The reinsurance business, or insurance policies for insurance companies, is the focus of the probe, because Spitzer suspects Aon's insurance-buying clients may not have received the best deal, the paper said.

Last week, Aon said that soliciting fake price quotations, bid rigging and accepting payments from insurers for not shopping the business around "would violate Aon policies," and it believes its employees have not done so, the Journal said.

62.     On these revelations, the Company's shares fell to $19.20 from $21.20, a drop of 9%.

63.     The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

        (a)     That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements;"

        (b)     That by concealing these "contingent commissions" and such " contingent commission agreements" the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars;

        (c)     That as a result of (a)-(b) above, as more fully described in ¶¶ 63-67, the Company's prior reported revenue and income was grossly overstated.

## MISLEADING FINANCIAL STATEMENTS

64.     In order to overstate its earnings during the Class Period, Aon violated Generally Accepted Accounting Principles ("GAAP") and SEC rules by failing to properly report and disclose the illegal nature of its revenue during the Class Period.

30

65.     These financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules. Aon manipulated financial statements by allowing the Company to generate fees which it was not entitled to, which revenues may be forfeited (via fines, judgments and costs associated therewith) and which artificially inflated Aon's revenue and income.

66.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

67.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, 10);

31

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, 34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, 40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, 50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

68.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS' SCHEME UNRAVELS

69.     On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks insurance industry; NY Attorney General sues Marsh over commissions." The article stated in part:

> In his latest move in a high profile campAONn against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.
>
> Spitzer unveiled a law suit Thursday against the world's largest insurance broker Marsh & McLennan for a common industry practice known as "contingent commissions."
>
> Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies

33

offering the highest commissions, rather than the ones most suited to their customers.

Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.

"The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

Shares of Marsh, AON and other leading insurance companies and brokers slumped. Marsh dropped 14 percent to $39.70 and AON lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AON is headed by longtime CEO Hank Greenberg. His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating. "The Hartford is cooperating fully with the New York Attorney."

### DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT
### AON STOCK WAS NOT A PRUDENT PLAN INVESTMENT

70.     At all relevant times, Defendants knew or should have known that AON was engaged

in the questionable business practices detailed above which made AON Stock an imprudent Plan

investment.

71.     AON, the Investment Committee and the Individual Defendants failed properly to

take into account the numerous practices that put AON Stock at risk as well as the fact that AON

34

Stock was inflated in value when determining the prudence of investing and holding Plan assets in AON Stock.

72.     As a result of Defendants, knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification at AON made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

73.     In addition, named and unnamed Defendants, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Committees to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

74.     The Company, the Committees and other individual Plan fiduciary delegates failed to conduct an appropriate investigation into whether AON Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding AON's improper activities so that participants could make informed decisions regarding AON Stock in the Plan, or otherwise failed to protect the Plan and its participants against inevitable losses.

75.     Defendant Ryan's failure in this regard is particularly acute. As a result of his role as AON's CEO and Board Chairman, Ryan knew or should have known of the Company's improper practices. Yet, upon information and belief, despite his obligation to properly and materially inform participants in the Plan of the true risks involved with holding AON Stock, he remained silent.

76.     An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in AON Stock offered by the Plan, under these circumstances,

35

was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

77. Because Defendants knew or should have known that Company stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company stock.

78. Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of Company stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

79. Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of Plan investment in AON Stock.

### DEFENDANTS REGULARLY COMMUNICATED WITH PARTICIPANTS IN THE PLAN CONCERNING AON STOCK OFFERED BY THE PLAN, YET FAILED TO DISCLOSE THE IMPRUDENCE OF INVESTMENT IN COMPANY STOCK

80. Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company's common stock. During the Class Period, the Company fostered a positive attitude toward the Company's stock and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information

36

concerning investment in the Company's stock. As such, Participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

81.     As noted above, these SEC filings and related Company statements and releases were inaccurate, incomplete and materially misleading, causing Plan Participants to purchase and to hold and maintain, Plan investments in AON Stock.

82.     The Company, the Investment Committee and or the Plan's individual fiduciary delegates failed to provide Plan Participants with complete and accurate information regarding AON Stock, such that the Participants could appreciate the true risks presented by investments in AON Stock and could make informed decisions regarding investments in the Plan.

## CLAIMS FOR RELIEF UNDER ERISA

83.     At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

84.     ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

85.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

37

86.     ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provide, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of

the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and

their beneficiaries, aid with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent man acting in a like capacity and familiar with such matters would use in

the conduct of an enterprise of a like character and with like aims.

87.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They

entail, among other things,

(a)     The duty to conduct an independent and thorough investigation into, and

continually to monitor, the merits of all the investment alternatives of a plan, including in this

instance Company stock, to ensure that each investment is a suitable option for the plan; and

(b)     A duty to disclose and inform, which encompasses: (1) a negative duty not to

misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence

might be harmful; and (3) a duty to convey complete and accurate information material to the

circumstances of participants and beneficiaries.

88.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

> ". . . in addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with
> respect to the same plan in the following circumstances: (A) if he
> participates knowingly in, or knowingly undertakes to conceal, an act
> or omission of such other fiduciary, knowing such act or omission is a
> breach; (B) if, by his failure to comply with section 404(a)(1), 29

U.S.C. § 1104(a)(1), in the administration of his specific responsi-
bilities which give rise to his status as a fiduciary, he has enabled
such other fiduciary to commit a breach; or (C) if he has knowledge
of a breach by such other fiduciary, unless be makes reasonable
efforts under the circumstances to remedy the breach."

89.     Plaintiff therefore brings this action under the authority of ERISA § 502 for Plan-wide

relief pursuant to ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches

of fiduciary duties by the Defendants.

## CAUSATION

90.     The Plan suffered at least millions of dollars in losses because substantial assets of the

Plan were imprudently allowed to be put at great risk by Defendants, through investment by the Plan

in AON common stock during the Class Period, in breach of Defendants' fiduciary duties.

91.     Defendants are responsible for losses caused by participant direction of investment in

AON common stock because Defendants failed to take the necessary and required steps to ensure

effective and informed independent participant control over the investment decision-making process,

as required by ERISA § 404(c), 20 U.S.C. § 1104(c), and the regulations promulgated thereunder.

Defendants concealed material, non-public facts from participants, and provided misleading,

inaccurate, and incomplete information to them regarding the nature of the Defendants' illicit

activities and therefore the ongoing earnings levels of AON, as well as the true underlying values of

AON Stock offered by the Plan, misrepresenting its soundness as investment vehicles.  As a

consequence, participants did not exercise independent control over their investments in AON

common stock and Defendants remain liable under ERISA for losses caused by such investment.

92.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties,

including the provision of full and accurate disclosure of material facts concerning investment in

AON common stock and divesting the Plan from Company stock offered by the Plan when maintaining such investment alternatives became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Company common stock.

93.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in AON common stock offered by the Plan, eliminating this investment alternative when it became imprudent and divesting the Plan from any then-existing investments in this investment alternatives when maintaining such investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through such continued tainted investment.

## COUNT I

### FAILURE TO PRUDENTLY AND LOYALLY MANAGE PLAN ASSETS<br>(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404)

94.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

95.     At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

96.     As alleged above, the Defendants were all responsible in different ways and to differing extents, for the selection, maintenance and monitoring of the Plan's investment options, including the option of Company Stock.

97.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment

options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in the AON Stock Fund in the Plan were prudent and are liable for losses incurred as a result of such investments being imprudent.

98.     Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

99.     The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that AON Stock was not a suitable and appropriate investment for the Plan as described herein for either (1) AON Stock purchased through participant contributions to the Plan or (2) AON Stock accumulated by the Plan through Company matching contributions. Nonetheless, during the Class Period, these fiduciaries continued to offer the AON Stock as an investment option for the Plan and to direct and approve Plan investment in AON Stock, instead of in cash or other investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendant failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in AON Stock.

100.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with

41

single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

101.    The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow Defendants' failure to prudently and loyally manage Plan assets in the exercise of their discretion with respect to the offering Company Stock as an investment option in the Plan despite knowing that such failures were breaches of their ERISA mandated fiduciary duties.

102.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

103.    Pursuant to ERISA § 502(a), 29U S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### FAILURE TO MONITOR AND TO PROVIDE ACCURATE INFORMATION(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY AON AND THE DIRECTOR DEFENDANTS)

104.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

105.    At all relevant times, as alleged above, AON and the Individual Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 20 U.S.C. § 1002(21)(A).

106.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of AON and the Director Defendants included the responsibility to monitor other fiduciaries.

107.     The duty to monitor entails both giving information to and reviewing the actions of

the monitored fiduciaries (the Committees).  In this case, that meant that the monitoring fiduciary,

AON and the Director Defendants, had the duty to:

(i)      Ensure that the monitored fiduciaries possessed the needed credentials and

experience, or use qualified advisors and service providers to fulfill their duties.  They must be

knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan

participants;

(ii)      Ensure that the monitored fiduciaries had ready access to such outside,

impartial advisors, counsel, and experts when needed;

(iii) Ensure that the monitored fiduciaries were provided with adequate financial

resources to do their job;

(iv)      Ensure that the monitored fiduciaries had adequate information and to do their

job of overseeing the Plan investments;

(v)      Ensure that the monitored fiduciaries maintained adequate records of the

information on which they based their decisions and analysis with respect to Plan investment

options; and

(vi)      Ensure that the monitored fiduciaries reported regularly to the Company.  The

Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

108.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are

performing their fiduciary obligations, including those with respect to the investment of plan assets,

and must take prompt and effective action to protect the plan and participants when they are not.

43

The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

109.    The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

110.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

111.    AON and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business improprieties alleged above, which made Company Stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified employer stock fund. AON and the Director Defendants knew or should have known that the fiduciaries it was responsible for monitoring were imprudently allowing the Plan to continue offering the AON Stock as a Plan investment, and continuing to invest in AON Stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

44

112.    In addition, as a result of its inappropriate practices and implicit knowledge thereof, AON and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of AON that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, Defendants breached their monitoring duties under the Plan and ERISA.

113.    AON and the Director Defendants are liable as a co-fiduciaries because: (1) they knowingly participated in the fiduciary breaches by their fellow Defendant-fiduciaries in the activities implicated in this Count; (2) they enabled the breaches by these Defendants; and (3) they had knowledge of these breaches yet failed to make any effort to remedy them.

114.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

115.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT III

### FAILURE TO PROVIDE COMPLETE AND ACCURATE INFORMATION TO PLAN PARTICIPANTS AND BENEFICIARIES (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 AND 405 OF ERISA)

116.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

117. At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

118. At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

119. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all Plan investment options, including investment in AON Stock.

120. Because investment in the Plan was not diversified (i.e., the Defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in AON Stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to AON Stock.

121. The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding AON Stock. AON's business improprieties, public misrepresentations and inflated earnings, and the consequent artificial inflation of the value of AON Stock and, generally, by conveying inaccurate information regarding the soundness of AON Stock and the prudence of investing retirement contributions in AON equity. These failures were

46

particularly devastating to the Plan and the participants and thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

122.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding AON Stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

123.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in AON Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in AON Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

124.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

47

125.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

126.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

127.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company stock.

128.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

129.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

130.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In

this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

131.     Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3): (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

132.     Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.     Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

49

C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Company stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price/value of Company stock;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: November 30, 2004

**MUCH SHELIST FREED DENENBERG AMENT & RUBENSTEIN, P.C.**

*Carol V. Gilden*

Carol V. Gilden, Esq.
Conor R. Crowley, Esq.
191 North Wacker Drive
Suite 1800
Chicago, IL 60606
Tel: (312) 521-2403

50

Fax: (312) 521-2303

– and –

**GAINEY & McKENNA**
Thomas J. McKenna, Esq.
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**Attorneys for Plaintiff**

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

DEC 0 1 2004

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

Yassin Hamwi

RECEIVED FOR DOCKETING
04 NOV 30 AM 10: 42
CLERK
U.S. DISTRICT COURT

## DEFENDANTS

Aon Corporation, et al.

JUDGE ANDERSEN

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Carol V. Gilden/Conor R. Crowley
Much Shelist Freed Denenberg Ament
& Rubenstein, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606 (312) 521-2403

ATTORNEYS (IF KNOWN)

04C 7729

MAGISTRATE JUDGE NOLAN

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☒4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury — Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motion to Vacate Sentence
Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☒ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS — Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

This is a class action pursuant to
Section 502 of the Employee Retirement Income Security Act,
29 U.S.C. Section 1132

## VII. REQUESTED IN COMPLAINT

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☐ YES ☒ NO

## VIII. This case

☒ is not a refiling of a previously dismissed action.

☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE
11/30/04

SIGNATURE OF ATTORNEY OF RECORD
Carol V. Gilden

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT.

## NORTHERN DISTRICT OF ILLINOIS

DEC 0 1 2004

In the Matter of

Yassin Hamwi, et al. vs. Aon Corporation, et al.

FILED FOR DOCKETING
04 NOV 30 AM 10: 43
U.S. DISTRICT COURT

Case Number:

# 04C 7729

JUDGE ANDERSEN

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR

Plaintiff, Yassin Hamwi

MAGISTRATE JUDGE NOLAN

| (A) | (B) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** | **NAME** Carol V. Gilden |
| **FIRM** | **FIRM** Much Shelist Freed Denenberg Ament & Rubenstein, P.C. |
| **STREET ADDRESS** | **STREET ADDRESS** 191 N. Wacker Drive, Ste. 1800 |
| **CITY/STATE/ZIP** | **CITY/STATE/ZIP** Chicago, IL 60606 |
| **TELEPHONE NUMBER** | **TELEPHONE NUMBER** (312) 521-2403 |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE** 06185530 |
| **MEMBER OF TRIAL BAR?** YES NO | **MEMBER OF TRIAL BAR?** YES (NO) |
| **TRIAL ATTORNEY?** YES NO | **TRIAL ATTORNEY?** (YES) NO |
| | **DESIGNATED AS LOCAL COUNSEL?** (YES) NO |

| (C) | (D) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** Conor R. Crowley | **NAME** |
| **FIRM** Much Shelist Freed Denenberg Ament & Rubenstein, P.C. | **FIRM** |
| **STREET ADDRESS** 191 N. Wacker Drive, Ste. 1800 | **STREET ADDRESS** |
| **CITY/STATE/ZIP** Chicago, IL 60606 | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** (312) 521-2725 | **TELEPHONE NUMBER** |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 90785839 | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** |
| **MEMBER OF TRIAL BAR?** YES (NO) | **MEMBER OF TRIAL BAR?** YES NO |
| **TRIAL ATTORNEY?** (YES) NO | **TRIAL ATTORNEY?** YES NO |
| **DESIGNATED AS LOCAL COUNSEL?** (YES) NO | **DESIGNATED AS LOCAL COUNSEL?** YES NO |

**PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE**